Please be seated. Welcome everyone. Good to have everybody back live and alive here in the beautiful Wisdom Building. I think you all know about the timer, and please be sure to try to finish up by the time it turns red. Please remember that rebuttal is for rebuttal only, and if you are citing to the record or referring to the record, it really helps if we get a specific record site. My colleagues have memorized the entire record, but I'm not quite there yet, so I would appreciate that. With that, we will call the first case, Case No. 20-50671, Thomas v. Hughes, and we'll begin with Ms. Harmon. May it please the Court. The District Court committed a number of errors in this case. They can be distilled to three categories. First, the Court excluded evidence essential to appellant's defense. Second, it allowed claims on which evidence of necessary elements was missing to proceed to the jury and then fail to grant judgment as a matter of law. And three, it approved fatally flawed recovery, including improper damages, unsegregated attorney's fees, unrecoverable costs, disgorgement of salary, and punitive damages, even though the evidence in law supported none of this. Each of these errors require vacation of the judgment, and some of them require judgment for appellants as a matter of law. Luann Hughes was sued in this case because in 2010, Plaintiff James Piercy was unable to get a jury verdict against her. In the 2010 lawsuit, the jury awarded $1 and found in favor of Ms. Hughes on all the other causes of action. In 2012, two years after that jury verdict, she stopped operating one company and started operating a different company in the same feed supplement line of business. That's basically . . . So the allegations of fraud here are new compared to the 2010 lawsuit. Right. It's a theory to Pierce . . . It's not as if the 2010 finding of just the $1 bars this case. No, of course not. But it is the reason that they are still trying to get her is because they were unable to get her then. They're trying to Pierce the corporate veil. All their damages theories, with the exception of the breach of fiduciary duty, go back to that jury verdict, including the attorney's fees and the interest since that time. Well, Counsel, you say they're trying to get her and still trying to get her, I think you said, and we meet again. So it's good to see you after a month. But the reality is this second lawsuit arises because she failed to satisfy the judgment from the first, the Texas case, correct? Well, she wasn't liable on the judgment in the first Texas case. Has the judgment been satisfied other than the supersedious bond? Right. The entity that was liable, PPI . . . The one she controlled. Sorry, what? The one she controlled. Yes, she controlled it, but it did not satisfy the judgment other than through the supersedious bond. But the reason it couldn't is because assets were moved to a new entity, correct? And so this new case, the one that's before us today, is all about transferring assets fraudulently to avoid paying or satisfying the prior judgment. Isn't that right? That is the theory. There was no evidence of any assets moved that weren't paid for. There was inventory moved, and it was paid for. The cash stayed in PPI. The accounts receivable stayed in PPI, and Ms. Hughes attempted to collect them the best she could for free. I mean, just because that's what she thought was the right thing to do. There was no evidence of any asset of value. But I mean, as soon as they showed up to collect on a judgment, she put it into bankruptcy. There's nothing wrong with putting a defined company into bankruptcy. Okay, so obviously whatever she gave the company didn't keep it in good stead. There was nothing in the company. This is a company that operates on an ongoing basis. She went out like Mr. Peercy before her. You go out, you make sales, you buy the product that you intend to sell, and you sell it. It's not like it was an auto showcase and there were cars. There was no cash transfer. Well, then why put it in bankruptcy if it's not doing anything? Bankruptcy is only something you need if there is actually anything to deal with. What is there to deal with? This is not in the record, but I don't think she was given good advice about whether to put the company in bankruptcy. But that's not in the record. She was advised that that was the right thing to do, and so she did it. She had bankruptcy counsel who thought that was the right thing to do. Let me ask you about her legal work. What kind of legal work did she perform as PPI's attorney? Is there any evidence of that? The only evidence is that her name was on a filing with the USPTO in, I believe, 2008. Did she create the documents to convert the company from one to the other? Is that her legal work? Well, again, the company wasn't converted. She started operating a new company that had existed. I think she opened it in 2006, Performance, the new company she opened in 2006. So there was no documentation? Well, there was documentation. In 2006, when she created the company, I believe she changed the name in 2010. But she wasn't doing—she didn't do any other legal work for PPI, none in the record certainly, and she did not do legal work for Performance. She did some accounting work for Performance. Nothing legal? No. Okay. But she didn't dispute having been the lawyer. She disputed having been the lawyer other than that one filing with the USPTO. Okay. I thought she didn't dispute that she had a fiduciary duty. Because of that one filing with the USPTO. We did argue that that was insufficient to give her a general fiduciary duty, let alone a general fiduciary duty years later. That was part of our argument in the motion for—well, I forget their name, the Rule 15 motion, was that their only evidence of a fiduciary duty was that one USPTO filing, and it was insufficient for the theories that they had of something that she did years later. So you're saying—I mean, we've got a jury verdict, and the jury verdict is actually fairly extensive. I mean, it's an interrogatory form that asks all these specific questions. So your contention is that as to every one of these key findings in the case in which we're reviewing today, the evidence is insufficient as a matter of law to allow the jury to have even reached those questions? I mean, point me to how that is the case. Okay. Misappropriation of trade secrets, for example. So trade secrets, the only evidence was that the formulas become obsolete after a couple of years. That's at 4183 and 4184 in the record. The products changed, and the product options changed. She was not selling the same products that Mr. Peercy had been selling. But wasn't there testimony or evidence that the products that were being sold by her new company were based on the products of the same chemical mixes, those kinds of things, derived from the old company? The expert initially said derived, and then on further questioning said evolved, but there was no attempt to quantify what that meant. There was no expert who said 75% is the same or 90% is the same or 20% is the same. There was no showing of that whatsoever. The old and new formulas did share some components. Dr. Speckman testified that many of the products he sold to many people shared those same components, but there was nothing special about the component mix in Mr. Peercy's old products and the products that Performance was selling. There was no evidence at all of the extent of the use, and the damages model was fatally flawed. The sole damages model for theft of trade secrets was that the jury verdict from the first case, including the attorney's fees, including the interest, was somehow the damages for theft of trade secrets. Well, counsel, isn't that because they'd already proved it once before in litigation? In other words, there was also an agreement underlying by which she and the company agreed to pay the Peercy's, I guess, certain amounts of money that were never paid from the get-go. Only the company agreed, not her. But again, she controlled the company, correct? Well, she had co-owners, but that was an agreement in 2006. What we're talking about is theft of trade secrets from 2012 to the time of trial. There is no evidence that an agreement in 2006 is the value that somebody would have placed on those trade secrets in 2012. And there's certainly no agreement that somebody would have paid interest and attorney's fees. I guess what I'm trying to understand is why she shifted from Point 1 to Point 2, in other words, Company 1 to Company 2. Even assuming arguendo, all this stuff about Australia calling her and Mexico calling her and whatever, it seems to me you still could fix it. So if Australia is saying your product is bad, you can still fix it. She tried to fix it, Your Honor. She tried to fix it from 2006 until 2004. How did she fix it just by moving it all to another company? That's what I don't understand. Because the new company got new registrations. So for purposes of the foreign companies, and the state of Texas was one of the places that there was a problem, it was a new company. So it wasn't carrying the liabilities and the reputation of the old company anymore. And part of what wasn't allowed to come in, there was the evidence of the Australia and Mexico and Canada, as you mentioned, but she also believed, and she was not allowed to testify, that Mr. Piercy had done other things, that there was problems with the labels, there was other misrepresentations that he was making out in the market. She wasn't allowed to testify about that. And the new company, because it had new registrations, because it was starting fresh with products where the labels matched what the product was, and there were not misrepresentations out there in the market, she believed that that was a legitimate reason to start a new company. Was it actually a new product? The products were different than they had been in 2006 when she bought the company. And there were some products that had evolved and some products that were brand new. At trial we went through a whole chart of what did you sell in 2006 when you bought the company and what were you selling at the 2012 through trial time period. And there were many products that were brand new and some products that had been sold before that weren't sold anymore. That's in the record at 4896 through 4901. But wasn't she doing business with the same companies? I mean, wasn't a lot of Company 2 the same as Company 1 in terms of just her life? Yes, in terms of her life, that's right. So really the reason, I mean, it doesn't make a lot of sense to me to say that to fix a problem you have to sort of fake a new company in order to fix a problem. I mean, it's a problem at your company, you need to fix the problem at your company. We certainly don't believe that she faked anything. It was out in the open, everybody knew what she was doing. Did Australia and Mexico and Canada know? Yes, because she had to get new registration. So why couldn't she just fix it with them if they knew she was essentially just renaming something in order to fix their concerns? Why couldn't she just fix their concerns? Because, I mean, it's the core that matters. They don't really care what you call the company, they care whether the products are, you know, legal or not or bad or not. Your Honor, the evidence of that in the record is limited because the trial court wouldn't even let her talk about what she thought the problems were. So she certainly couldn't talk, therefore, about what she did to fix them and why. Did the court prevent her from making a record of what she wasn't allowed to put in? The court let us make the record generally of the Australia, the Mexico, and the Canada. We did not make an offer of proof of the collateral estoppel res judicata stuff because that was discussed in the motion eliminating proceedings. So we didn't make a separate formal offer of proof of that. Okay. But, I mean, you're saying, well, there's not much in the record on this. Okay. Then I'm asking were you all prevented from creating that? I understand you were prevented from giving it to the jury, but that doesn't prevent the proffer. I mean, I've had a judge tell me to sit down and essentially shut up. That prevents a proffer. I get that. Were you all in that situation? Because, I mean, I didn't see where that was raised. He did. I wanted to call Ms. Hughes to the stand to offer the testimony, and the judge said no, that I should do it from the podium. And so, to some extent, I was prevented from doing that because if I had had to go back and forth, then I could have asked more questions as opposed to just getting . . . What about deposition pages? I'm sorry? Deposition pages as a proffer? Well, they took her deposition, so it wouldn't have been my evidence. My proffer would have been what I would want her to say, not what the plaintiff asked her in her deposition. I mean, I've had the experience of plaintiffs asking about things that the person is claiming. Fair enough. Go ahead. You can finish up your argument. Thank you, Your Honor. There's just not a . . . Well, and I'll say this. In the fraudulent transfer, which we're actually talking about, not the theft of trade secrets, there are a number of cases where a party closes one company and opens another company at a time where there's some debt out there. And if that was always a problem, then all of those cases would come out in favor of the plaintiff, and that's not the case. But, counsel, it's not always a problem, and it's not always the case where you have the debt as a judgment that a jury has found against the company as well as the individual that controls the company, and then the transfer happens. In other words, you've got a timing issue. You've also got an issue, and I was going to ask about this, if I may, given that she's running out of time. What do we do with the fact that there was a sale agreement and a royalty agreement and a payment stream as well as the right of PPI, I guess, to acquire the trade secrets after a given period of time, but that agreement was totally disregarded by Hughes and her company? In other words, they never made payments on the royalties. They basically ignored what they were supposed to do, were they not? They disregarded the agreement. That is totally incorrect, Your Honor. Tell me how I'm wrong. There was an agreement for the sale of the company. That was paid. There was a consulting agreement. That was paid. There was a royalty agreement under which they paid hundreds of thousands of dollars until the parties got into their dispute. Mr. Peercy got a million dollars for his company, including the royalties, even without the royalties, although, again, that was hundreds of thousands of dollars. He got $500,000 for a company that the trial court found was only worth $300,000. So there were many agreements that were not breached. The only one that was breached . . . But the one that led to the Texas litigation was breached, and that was the royalty agreement relating to the trade secrets, correct? Correct. And the jury found against your clients with regard . . . No, Your Honor, no. The jury found against PPI. PPI is not my client. PPI is the debtor.  My client was not found liable for . . . He was just found liable for the breach of fiduciary duty and the dollar damages. One dollar. And the other two defendants were not part of that case whatsoever. Neither performance nor advance, which, by the way, there was no evidence of anything, were parties to that case.  Well, you've saved some time for rebuttal. Thank you very much. Thank you, Your Honor. All right. Mr. Richards? Thank you, Your Honor. May it please the Court. Just to address one or two items that came up in questioning, business intangibles are assets, and those are assets that were used by the new company. Ms. Hughes testified she didn't think they had any value, but that doesn't mean that they had no value. The jury didn't have to believe her version of that, and so the business intangibles are . . . What about her argument that just not believing her isn't evidence of anything? I agree that's what is being argued. However, there was clear testimony that the new company used the same employees, used the advertising, used the same products, because Calspec, who's their expert on products, testified. PPI, the original debtor, had these products after they were evolved. The identical products were still being sold by Performance Probiotics thereafter. Performance Probiotics sold 90% of its sales from 2012 to 2017 to the same customers that Performance Products had sold to. So all of the business intangibles, as well as the products, were transferred over to the new company, and whether she testified that nothing was transferred or not didn't mean that there wasn't evidence of those assets being used by the new company. Now, I would like to mention a couple of things that don't come out of the record. I've known Jay Pearcy, or I knew Jay Pearcy, starting in 2007. Ms. Hughes . . . I mean, Ms. Hyman doesn't have the history of this because she's the fifth lawyer to take this case for Ms. Hughes over these 14 years that I've represented the Pearcy's. Okay. That's irrelevant, really, to the question of whether we should affirm or reverse, in whole or in part. Okay? So I appreciate the jury was the one who had to decide if Ms. Hughes is lying. We just have to decide what the evidence supports. Is there evidence to support it? Let me ask you about this whole hearsay issue. You came in and told me it was raining outside, and I, therefore, took some action that I later had to explain. I wouldn't have to prove that it was true or false whether it was raining outside. I would have to prove that you told me that, and that's why I went off and did this. It wouldn't matter whether it was actually raining. It would matter that I thought it was, and that's why I took the action X that I'm now explaining. So that is her argument about the Mexico, Australia, whatever. It doesn't matter if this was actually messed-up product. It matters that she thought that. Now what is wrong with that argument? Well, to start off with, the first time this issue came up was in the counterclaims filed in Comal County in 2008. And so somehow this company limped along with these grievous problems that she couldn't solve for four years until she finally decided after her appellate bond prevented us from conducting discovery that it was time to make this switch. And so this is really just a fabrication. The argument being—I realize, but the argument being— Is it hearsay to say the Australian official told me that my product is illegal even if it actually wasn't illegal under Australian law? If I fought that, so I ran off to try to fix it, why isn't that not hearsay? The argument being made is that Wallace requires—Wallace v. Texas Tech— requires the court to reverse on the basis that this was not hearsay. That's not what Wallace says. Wallace merely stands for the proposition that a trial court has discretion to make that decision about whether or not it's admissible for a non-hearsay purpose. Well, but I think Judge Haynes' point is that it's not really hearsay because it's not offered to prove the truth of the matter asserted. I mean, so the question is not—the question is, isn't the court's discretion abused if the court makes an erroneous ruling and shuts down Ms. Hughes from testifying about things that would have explained what her actions were? I mean, is that— And I certainly understand the argument being made, and I agree that the argument could be made, and I believe that the trial court had discretion to make the decision that it made. However, there is also the problem that the names and addresses and phone numbers of all of the individuals who allegedly said these things were never provided in response to Rule 26 disclosure, which is specifically required under the Rule 26 disclosure rules. Now, Rule 37 makes it clear that if persons with knowledge of relevant facts are not disclosed as required under Rule 26, then the evidence of their involvement cannot be used by the party who failed to make the disclosure. We raised this issue in summary judgment briefing multiple times. Ms. Hughes was not confused prior to trial that we were making the Rule 26 and Rule 37 exclusion argument and never supplemented discovery. There is a—similarly, documents that are being used— So you're saying even if it's not hearsay, you still get to explore whether the person said it. Did you tell me it was raining outside? Whether that was true or not, did you actually walk in and say, it's raining outside? So people would want to find you and ask you, hey, did you say that? You know, and so on. Absolutely, Your Honor. The prejudice to my clients is clear in that people whose names, addresses, and phone numbers we've never been provided allegedly said all of these horrible things happened in Canada and Mexico and in Australia. We never had the opportunity to ask them if they actually had those conversations, what they were basing that on. We never got to see the letters or the test results that were allegedly discussed in these. And so my client is prevented under legitimate discovery interest from testing the validity of anything that Ms. Hughes said. You're saying we don't have to decide the hearsay issue because regardless of whether it's hearsay, because you all couldn't talk to the people who supposedly said all this, we just kind of throw it all out? Absolutely. I mean, that's expressly what Rule 37 says, Your Honor. And there was some argument in the briefing that I should have come up with more authority for that. Rule 37 says what it says. A party may not use. And so the rules are very explicit, and there's no reason that the court needs to make a difficult call on the hearsay issue because Rule 37 is an exclusionary issue, and it's the same exclusionary issue in state court and every court I've ever been in. If you fail to provide information in response to discovery, you don't get to bring it at trial. So these individuals never tendered any sort of testimony, no affidavits, no depositions? None. Once again, now admittedly in her deposition she identified the name of her Mexican distributor who was one of the persons who said that somebody else in Mexico told him something. But the person in Mexico was never identified. Despite the fact that it was her distributor, she never gave us his address or phone number, and so we had no way of tracking him down and contacting him to verify what he said, whether he said those things to her or not, and if there was any basis for them in the underlying documentation. Let me ask you about the exemplary damages. It's my understanding that the exemplary damages for misappropriation of trade secrets requires proof that misuse specifically intended for your client to suffer substantial injury that was independent and qualitatively different from the compensable harms associating with the underlying causes of action. Now what is that difference, that special malice? Not enough to have just caused compensatory damages, but something different. What is the something different that she did? And I'm not sure what it is you're reading from, Your Honor. I believe that the— Verizon Healthcourt v. Acadia Healthcare, 520 Southwest 3rd, 848. My apologies, Your Honor. I did not review that. My understanding is that punitive damages are governed by the state law, statutory law, which permits intent, malice, or gross negligence, and so gross negligence is a standard that requires a reckless indifference to whether or not a substantial injury will occur. The jury was certainly allowed to find, and Judge Ezra did make the finding that the evidence supported nine badges of fraud. I can find you the case, the record site for that, which is ROA 4352. But counsel, the nine badges of fraud are for the fraudulent transfer claim. Are you saying that those nine badges would also support exemplary damages? The findings of Judge Ezra and of the jury were that she committed fraud. The nine badges of fraud were some of the findings that demonstrated that fraud occurred and that she did it with the intent to prevent Peercy from collecting his judgment. But now wait, I may be confused. It won't be the first time today or the last, but I thought the exemplary damages were awarded in relation to the misappropriation of trade secrets, right? You're correct, Your Honor. But right back to Judge Haynes' point. You have this law out there that says it has to be a special malice or some harm that's beyond the harm that arises because of the misappropriation of trade secrets. So back to her question, what is that here? It's the intent to defraud. All of the evidence went to all of the issues. All of the things that demonstrated that she was committing fraud was also the evidence that she was misappropriating the trade secret. So you're saying there's not extra, there's nothing extra here? Well, I mean, there's evidence that she intended to defraud him, and that is— But you wouldn't have to have that for the content support damages. Not under trade secret, Your Honor. Intent to defraud is not an element of trade secret misappropriation. It is merely used— One of the aspects that you had proven in connection with that, and I realize there may be circumstances where you don't have to have it, but— Well, I believe the well-logics case that is cited in all of the briefings repeatedly says that what you have to demonstrate for misappropriation of trade secret is a use. Now, this was a use that was in breach of a contract, and it was a use so that she could develop and accelerate her research for her new products. That does not require fraud or fraudulent intent. That merely requires— That's true. I understand that. But as part of the breach of the confidential relationship by improper means, that is where you—that's what you use the fraud for. I believe they're distinct, Your Honor, and I beg to differ that misappropriation only requires misuse of something acquired in breach of a contract. Misuse and breach of a contract are substantially less threshold proofs than intent to— Oh, I'm well aware of that. People can breach a contract without fraud, and I get that. And therefore, since the evidence also demonstrated, and I'll read to you— So you're saying the add-on is that she didn't just steal it. She stealed it with— Stole it. Stole it with malice. And intent to defraud. And with or with, alternatively, you know, recklessness, which is always required under the Texas statute. Now, what is being argued is that there was no evidence to support any of the findings of the jury. I must have attended a different trial, and Judge Ezra must have attended a different trial, because he found all of the evidence supported these. And his findings are in the record. At R01-4343, the court found that the acts of Hughes constituted various fraudulent acts taken for her own direct and personal benefit, and that the corporate bail should be disregarded. So Judge Ezra found there was fraud. Judge Ezra found that she had transferred all of the business intangibles to herself and to Performance Probiotics without any compensation, and that they continued selling the same products to the same customers using the information relied on by Performance Products. What is the evidence supporting the breach of fiduciary duty? What is the evidence? Well, I'd like to back up, and I will answer your question, but let me back up and address a question that was raised earlier. At the jury conference, jury charge conference, the proposed charge put the burden on Ms. Hughes to disprove breach of fiduciary duty because she was his attorney. That jury question is in accordance with Texas law that once there is a formal fiduciary duty established, the burden is on the fiduciary to disprove. There was no objection to this submission in this form at charge conference. Now, at appeal, what we're hearing is, well, she was only a little bit his attorney, and therefore this question has no evidence to support it whatsoever. The time to make that objection is at the jury charge conference, and the question, if that was supportable, the question would be, was there a fiduciary duty? That question was not submitted and was not requested. Therefore, the established fact of her fiduciary duty was set before the jury by agreement. She then, in the role of the attorney and many other roles, decided to transfer all the business intangibles from her client to a new company and then pay herself $900,000 in compensation from the new company selling the products of the old company. That is evidence of self-dealing, and it is benefiting from misappropriation of her client's assets. So that's the breach? That is breach of fiduciary duty, and that is specifically what Judge Ezra found because the argument being made is, well, the jury shouldn't have awarded damages. The jury didn't award damages. If you read Judge Ezra's judgment, he clearly states this is an award by the court in its equitable powers and is required because of her breach of fiduciary duty. Oh, go ahead. But the breach was the fraudulent transfer, correct? That's your allegation that that was the breach of fiduciary duty? The same facts. Is there anything other than that where she acted as the attorney? I'm sorry, say again? Is there anything other than that where she was acting as PPI's attorney? I don't believe we put on additional evidence of her actions as PPI's attorney. Once again, because we had established the existence of the attorney-client relationship, the burden shifts to the attorney to disprove the breach of fiduciary duty. The evidence was more than sufficient to establish that she engaged in self-dealing, benefited herself, and that her client resulted in bankruptcy without the ability to pay a judgment that arose. Okay, let me ask you about this whole double recovery point. If somebody walked up and paid the Commonwealth County judgment, how would Ms. Hughes be able to show you can't sue me for X? In other words, how does this judgment as written make clear that this isn't in addition to on that point? Well, I will answer your question. On the alter ego point. I will answer your question, but I want to back up and say, we're now in this court where there's being a request that the court reverse as to the trade secrets and reverse as to the piercing the corporate veil, both of which provide for the recovery of that judgment. It is not inconceivable, I don't think the court will do this, but it's not inconceivable that the court might decide one of those is flawed and the other is not, and therefore Judge Ezra then has instructions upon return to his court as to what the judgment is, because if it gets knocked out in the piercing the corporate veil, it's still valid under the trade secret. Now, to get to your question, any time an amount is paid under the judgment, the party who's benefiting from that payment . . . But it's not the judgment. It's another judgment. The Commonwealth County judgment. The problem is we have here two judgments from two very different courts, so it's not just there was a judgment sitting around for a million dollars and somebody paid $500,000. How did they get evidence of that? Same judgment. I'm talking about where she's liable on the piercing the veil, alter ego, whatever. How does she show, hey, the Commonwealth County judgment was paid? Well, PPI is the only entity that is liable on the Comal County judgment. She was not individually liable on that. However, if that judgment were paid through the Comal County clerk in some way, no doubt Ms. Hughes would notify Judge Ezra's court that partial satisfaction of his judgment had occurred by that payment, and I have no doubt that Judge Ezra would agree and say, therefore, the remaining obligation . . . There's nothing in the judgment that tells us that. There is, I believe, Judge Ezra's discussion of that in his denial of the JMOL, but the judgment itself does not articulate that. Okay. Let me ask you one other thing about the judgment itself. My knowledge of injunctive relief is the whole point is that you can't recover money damages, and here you are recovering money damages and yet also getting an injunction, so please explain that. I don't recall the case site off the top of my head, but I know that I referred to it in the briefing, and it says the injunction is there to prevent the use of the trade secret improperly and benefiting from it while the judgment remains unpaid. Now, this is a moot issue because there is an agreed order transferring the assets of performance probiotics under a turnover order to the plaintiffs, and therefore, performance probiotics is no longer attempting to sell the products that are subject to the trade secret. I'm out of time, Your Honors, and I appreciate it. A wrap-up. I'll give you a second to wrap up. We've been at this for 14 years. The Pierceys really would appreciate this Court's granting them justice, and we appreciate your attention. Thank you very much. Appreciate your honor. All right. We've got a lot to take on, Ms. Hyman. Thank you. Yes, they've been at this for 14 years, so they had time to come up with viable damage models and experts to meet the elements of the causes of action they chose to plead. Do you want to correct? Mr. Richards said that she was his attorney. That's not at issue in this case. The only issue in this case is whether and when she was PPI's attorney, and again, the only evidence of that was that one filing with the USPTO. Yes, because that existed, we agreed that for that purpose at that time she was his attorney, but they still had to tie anything she did wrong to that fiduciary duty. What is your answer on exemplary damages? You heard my conversation with him that it's enough to have shown fraud that gives you exemplary damages under the misappropriation. What do you say to that? I clearly disagree. One thing, we don't think that it has shown fraud, but to the extent they have, that was a different theory, a different time. It's not that she took the trade secrets. If she took them, she took them back in 2012, 2010, whenever, and that's not what they were complaining about. You're saying the fraud they're relying on isn't directly part of the misappropriation, so they do need to show the malice that I read the case on. Correct, and the recklessness doesn't work because it's an intentional tort. Yes, I didn't understand the gross negligence part of it. Counsel, let me ask you this with regard to the exemplary damages. Can it be considered that . . . I'm just going to throw some things out, tell me how I'm wrong. They got a judgment in state court. The judgment's not been satisfied. They had to go sue and litigate for ten more years. She set up another company. She transferred assets, and so there's this conduct that does go, I guess, maybe more to the fraud. Can the jury consider any of that as the . . . I'm going to use the word special malice that Judge Haynes brought up, the additional conduct beyond the misappropriation of the trade secret? I don't think so. I think that the conduct in question has to relate to the misappropriation of the trade secret. Otherwise, any time you had some other wrongdoing in the case . . . Was the jury entitled to credit, for example, the shifting of assets and companies and entities as continuing the misappropriation? In other words, there was a reason those assets moved from one company to another and all that. Tell me how I'm wrong. Again, we don't believe that any assets moved. In fact, when Mr. Richards was speaking, he said that the business intangibles were used by the new company. The only tangible assets that were transferred were paid for. The cash sat in the bank. The inventory was paid for. The registrations stayed there. There were business intangibles. Okay, but assuming, arguendo, that we were to affirm on the inappropriate transfer of intangible trade secrets from the first company to the second, is that enough to support exemplary? I don't believe so. Why not? Because, again, I think it has to be wrongdoing, intentional fraud, wrongdoing beyond the use of the trade secrets, but that relates to that tort. It can't be wrongdoing that relates to something else. Okay. You're saying you can't take this generic bucket and just start putting one in the other and whatever. There's a lot of causes of action, and you're saying they need to all fit with each other. What about the injunction? Is that moot now? It probably is. Because of the injunction, she couldn't operate the company anymore, so we entered into an agreed order that they could have the assets, which they didn't pick up, but there you go. That's not in the record. So should we just vacate the injunctive relief as moot? I believe you should vacate it as moot. I think you all need to write us a letter on that because mootness is kind of after the fact we need to know about because that's jurisdictional. And if you all are in agreement that it's moot, I think a letter to S28J on that would be helpful. Yes, Your Honor. I did want to address the Rule 26, Rule 37 issue because as Mr. Richards stated, all of the evidence went to all of the issues. And Judge Ezra himself also made these factual findings. He was also limited in what he considered because of the keeping the evidence out. So I wanted to point out, and this is in our brief, that in the Rule 26, 1993 Amendment comment specifically says that disclosure is not required when information is disclosed in the deposition. And all the information that they are complaining about was disclosed in the deposition in the existence of these people. Addresses and... Not addresses, but phone numbers. But they knew who they were. They didn't specifically say, you know, what's the address and the phone number. Well, they'd already asked that, right? Well, we weren't relying on that testimony. We thought it was hearsay, non-hearsay. We were relying on her statement. What is your answer on the double recovery issue between the two judgments? If we were to agree with you that that's a potential issue, what would we say to the district judge on that? What are you asking? I think it's an election of remedies. Correctly, if you reversed one of those two causes of action, then it would go back and he could enter judgment on the other. But you can't have them both in the same judgment. It's an election of remedies if the damages are the same. All right. Thank you, Your Honor. Thank you. All right. Thank you, counsel. Your case is under submission. And I would request that y'all send us the letter on the mootness by July 13th. Yes, thank you. I just touched on it.